**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ROSHANI SHETH<br><br>        Plaintiff<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS,<br><br>        Defendant | Case No. 1:24-cv-05061<br><br>Judge Georgia N. Alexakis<br><br>(Jury Trial Demanded) |

## AMENDED COMPLAINT

NOW COMES Plaintiff, ROSHANI SHETH (Plaintiff), by and through her attorneys WILT TOIKKA KRAFT, LLP, as and for Plaintiff's Complaint against THE NATIONAL ASSOCIATION OF REALTORS (Defendant or NAR) to redress unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), 42 U.S.C. § 2000e *et seq.* and discrimination under 42 USCS § 1981. This action is also brought under the Illinois Human Rights Act (IHRA), 775 ILCS 5/2-101 *et. Seq.* In support of this Complaint, Plaintiff states as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, Roshani Sheth, is a resident of Chicago, Illinois.

2. Plaintiff began working for Defendant on or about May 27, 2014 as a Product Manager until October 2, 2019.

3. Defendant, National Association of Realtors, is a trade association for individuals employed in the real estate industry and has its headquarters at 430 North Michigan Avenue Chicago, Illinois.

4. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1331 and 1343. Claims are asserted under 42 U.S.C. § 2000e which also confers jurisdiction on this Court.

5. Claims are also asserted under the Illinois Human Rights Act, 775 ILCS 5/2-101 *et. Seq.,* over which this court has pendant jurisdiction under 28 U.S.C. § 1367(a).

6. Venue is proper in this judicial district as a substantial part of the alleged actions and claims in this Complaint arose in this district. Furthermore, venue is proper as Plaintiff resides in and Defendant operates in the Northern District of Illinois.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

1. On July 28, 2020, Plaintiff dual-filed a Charge of Discrimination with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC) under Title VII and the IHRA.

2. On September 2, 2022, the IDHR issued a letter informing the Plaintiff that the time limit for the completion of its investigation had expired, and that it would be forwarded to the EEOC for investigation.

3. On March 20, 2024, the EEOC issued a Determination and Notice of Rights, informing the Plaintiff of her right to sue.

## FACTS

1. Plaintiff, a woman of Indian descent, was employed by Defendant in their Chicago headquarters, from May 27, 2014 until October 2, 2019. She was the only woman and person of color on her team.

2.      Defendant is the nation's largest trade association, employing more than 200 people and regulating more than 1.3 million members of the residential and commercial real estate industries and 250,000 real estate firms. All REALTORS®[1] are required to be a member of the association. It has more than $1 billion in assets and controls access to nearly every American home listing. It exercises significant power in the residential and commercial real estate industries.

3.      The Realtors Information Network (RIN) is a wholly owned subsidiary of NAR, sharing office space, human resources and legal functions, administration, and leadership, including a shared Chief Executive Officer, Bob Goldberg. Plaintiff's direct supervisor Ken Burlington served as both the Chief Operating Officer of RIN and the Vice President of NAR.

4.      In August 2023, Defendant's then President Kenny Parcell resigned in disgrace after the New York Times published an article detailing complaints on behalf of multiple women of harassment and inappropriate behavior, as well as extensive acts at retaliation. During Plaintiff's tenure, Parcell held the title of Vice President, but he nevertheless exemplified the culture of fear, harassment, deflection, and retaliation that permeated the organization and its leadership ranks. This article also led to the early retirement of NAR's CEO Bob Goldberg as well as Senior Vice President of Talent Donna Gland.

---

[1] Real Estate Agents are licensed professionals who facilitate property transactions between buyers and seller. REALTORS® are licensed professionals who are members of the National Association of REALTORS® and adhere to a strict Code of Ethics. When Is a Real Estate Agent a REALTOR®? (nar.realtor) last accessed August 26, 2024.

5.      When asked in an interview if the organization has an issue with sexual harassment, the N.A.R. chief executive Bob Goldberg said, "I would not characterize it as a problem." He later clarified in an email through a spokesman for the organization, "We operate in a society where, unfortunately, inappropriate conduct can occur. Like any organization, we are not immune to these challenges, and any single allegation concerns me."

6.      Burlington often objectified Defendant's female employees and members, making at times lascivious, objectively offensive, and entirely unprofessional comments regarding their ages, sex lives, marital status, bodies, and using terms like "bitch" in Plaintiff's presence. Burlington, has also used sexist terms to describe Plaintiff such as calling her "aggressive" where he would call a man "assertive." Furthermore, in her presence lamented that "[t]here is no safe place for old white men" or words to that effect; he did not make it clear what he sought safety from, though his future conduct towards Plaintiff seems to suggest that he wanted greater safety to harass and discriminate against women and minorities with impunity.

7.      Plaintiff's role required her to work with strategic partners to grow RIN's business, one of which was Second Generation, Ltd., led by the company's President, Matthew Embrescia.

8.      Embrescia, even prior to making his first sexual advances towards her, treated Plaintiff less favorably than he did other of Defendant's employees. Embrescia refused to make eye contact with Plaintiff, made inappropriate comments about her marital status, made lewd comments about her body, and stared at her breasts, all

behaviors that Defendant's own policies and procedures prohibit as unlawful sexual harassment.

9.  Embrescia inappropriately criticized Plaintiff for her career ambition and attention to her role, which he described as "unattractive." In May 2015, Plaintiff refused Embrescia's sexual advances, after which his treatment of her further deteriorated. Embrescia began avoiding Plaintiff, ignoring her, and devaluing her contributions and recommendations.

10. Plaintiff complained to Burlington about Embrescia's treatment of her, but despite enquiring as to whether the conduct was based upon her race or sex, Burlington took no action to prevent Embrescia's conduct, despite being the agent of the Defendant most empowered to control Plaintiff's work environment and conditions.

11. Despite Defendant's treatment of her, Plaintiff met or exceeded her employer's reasonable expectations.

12. In the Fall of 2018, Burlington promised to promote her to Director the following year.

13. In February 2019, she received a glowing performance review from Burlington, which praised her significant contributions to the successful .realestate launch, technical skills, devotion to her work and the organization, and creative thinking. He praised her for her ability to work independently and for "car[ing] about [NAR] members and her projects."

14. In March 2019, Burlington denied Plaintiff the promised promotion, later justifying his refusal based on her "inability to collaborate effectively" with Embrescia, who Burlington knew at the time had been harassing the Plaintiff.

15. In April 2019, Plaintiff met with Defendant's Director of Internal Communications and Talent Development Julie Bleasdale to discuss the discriminatory treatment to which she had been subjected.

16. Following the meeting with Bleasdale, Burlington began to treat Plaintiff with marked hostility, making it clear that Bleasdale had violated any confidentiality Plaintiff might have expected in attempting to address the harassment she experienced.

17. Plaintiff met with Bleasdale again in June 2019, after Burlington's hostility began to frighten her.

18. On June 11, 2019, Plaintiff emailed Bleasdale detailing the harassment and retaliation she was suffering at the hands of Embrescia and Burlington. Bleasdale escalated Plaintiff's concerns to Donna Gland, Defendant's Senior Vice President of Talent Development and Resources and to Linda Russell, Defendant's Director of Talent Development and Resources.

19. On June 18, 2019, Gland and Russell met with Plaintiff. During the meeting, Gland referred to Plaintiff multiple times as an immigrant, despite the Plaintiff informing her that she had been born in the Chicagoland area. Gland and Russell acknowledged that the actions of Burlington and Embrescia created a hostile work environment, but one that was not unlawful because she had not complained to them that the discrimination she experienced stemmed from her race, ethnicity, or gender. Gland dismissed Plaintiff's concerns when she reiterated the race and gender elements of the discrimination she experienced. They suggested that she speak with Burlington, one

of the key perpetrators of the hostile work environment, about her concerns; alternatively, they said she could resign.

20. On or about June 19, 2019, Plaintiff made internal claims of discrimination.

21. On June 25, 2019, Burlington told Embrescia that Plaintiff had filed a harassment complaint, and expressed that Gland believed him (Burlington) and not the Plaintiff. Plaintiff reported this interaction to Gland and Russell.

22. On or about July 15, 2019, Plaintiff was made aware by a coworker that HR had closed the coworker's complaint of Embrescia's alleged sexual assault she experienced in April 2019. She was concerned for Plaintiff, who was the only of Defendant's employees who worked with Embrescia on almost a daily basis. This was later recounted by another former employee and mentioned in a Chicago Sun-Times article.

23. On July 19, 2019, Gland and Russell met with Plaintiff and informed her that HR was closing its investigation into her harassment claims, and additionally that Plaintiff was being placed on a Performance Improvement Plan (PIP).

24. As she seemed upset, Russell told Plaintiff she could leave early. When Plaintiff opted to compose herself and finish the work she had, Gland escorted Plaintiff to her desk, telling her to pack her things, and then marched her out of the building in front of her coworkers. By contrast, when a male employee was terminated earlier in the year for sending inappropriate photographs to coworkers, he was not marched out of the office.

25. On July 29, 2019, Russell and Burlington presented Plaintiff with her PIP, in which the areas identified for improvement were "not meeting the CORE Values of NAR,"

namely collaboration and respect. Notably, as recently as her February 2019 performance review, Burlington rated Plaintiff as "sometimes exceeding" in both areas. Plaintiff's deficiencies in these areas primarily involved her efforts to seek non-discriminatory treatment with respect to Second Generation Ltd., Burlington, and Embrescia.

26. Defendant's PIP is a flagrant example of its retaliatory nature: it targeted areas the Plaintiff demonstrably exceeded expectations in as noted by Defendant's own employees on a very recent performance review, and had as its primary scope Plaintiff's work relationships with Burlington and Embrescia, the two individuals who relentlessly subjected the Plaintiff to discrimination. Neither did Plaintiff fail to demonstrate respect or to collaborate effectively at NAR, nor has the Plaintiff ever in previous employment or subsequent employment relationship been found wanting on those counts.

27. On August 29, 2019, Defendant continued its retaliation by extending the PIP through September 9, 2019.

28. On September 5, 2019, Plaintiff took a protected medical leave of absence under the Family and Medical Leave Act. Upon attempting to return to work, Russell told Plaintiff to go home and return the next day.

29. On October 2, 2019, Plaintiff returned to the office as instructed, but was refused entry, informed by the security guard that her employment had been terminated. Later that day, Gland left a voicemail expressly terminating Plaintiff's employment. Two days later, Gland sent a letter stating that Plaintiff was terminated "as a result of [her] failure to meet the expectations of the Performance Improvement Plan."

30. Plaintiff's employment was terminated by Defendant on October 2, 2019 in retaliation for filing internal complaints of discrimination with Senior Vice President Donna Gland & Talent Director Linda Russell of Human Resources and separately, the Chief Legal Counsel Katie Johnson.

31. On December 19, 2019, Plaintiff entered into a settlement agreement (Agreement) with Defendant.

32. In the Agreement, in consideration for Plaintiff signing the agreement, among other things Defendant agreed that for "all employment reference requests" directed to the Defendant's "Talent Development Department only (or any other successor department performing the same or similar tasks) …to respond to such requests by providing only [Plaintiff's] dates of employment and position titles."

33. While the Agreement required the Defendant to provide a neutral employment reference, the contact information they provided to allow Plaintiff to direct employment references towards included a phone number that went directly to Gland, an employee of Defendant who previously made inappropriate comments regarding Plaintiff's race and ethnicity, as well as false attributions regarding Plaintiff's national origin, and played a substantial part in enabling Defendant's harassment of Plaintiff.

34. Following her termination, Burlington has continued to disparage Plaintiff to those who could have otherwise provided personal references for her by spreading false information about her relationships with Embrescia, Second Generation, and HR. A former coworker informed Plaintiff that Burlington repeatedly painted Plaintiff as a liar and that she "gave HR a hard time."

35. Plaintiff spent an extended period unable to obtain alternative employment despite her excellent credentials and more than 100 applications for positions for which she was qualified.

36. On November 18, 2022, a verification specialist at Shield Screening informed the Plaintiff that despite making "several attempts" to contact Defendant, they could not verify the employment details.

37. In one incident, Plaintiff made it to the final round of interviews for a real estate start-up company, only for the company to abruptly and unexpectedly cease communications without explanation, despite a commitment to follow up with her by a specified date. Plaintiff believes the startup was in touch with NAR, whose data is featured on their website.

38. On February 11, 2021, IDHR took up the Plaintiff's case and requested documents to be provided to them by February 16, 2021.

39. On February 16, 2021, Plaintiff's new counsel requested an extension through February 19, 2021, which was granted.

40. Between February 17, 2021 and February 19, 2021, Defendant, through its agents, sent Plaintiff a series of harassing text messages. These messages told her to "shut up," called her a "rat," and included shorthand for "kill yourself." This conduct is not only violative of the settlement agreement between the parties, but further established the post-employment retaliation plaintiff has suffered.

41. These texts line up exactly with the IDHR's consideration of her case, were sent in response to Plaintiff exercising her rights under federal and Illinois law, and are inherently unlawful.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

RETALIATION IN VIOLATION OF TITLE VII

42.  Plaintiff hereby incorporates by reference all paragraphs of this Complaint numbered 1-39 as if fully set forth herein.

43.  Plaintiff as a female and a person of color of Indian descent is a member of the classes of citizens protected by Title VII.

44.  Defendant was aware of Plaintiff's sex, race, and color.

45.  Defendant has, by its egregious, overt, and continuing acts of discrimination as well as the maintenance of an environment that fostered and encouraged discriminatory conduct, subjected Plaintiff to adverse employment actions and a hostile work environment based on her sex, race, color, and perceived national origin.

46.  Defendant created and maintained work environment for the Plaintiff which was both subjectively and objectively offensive, severe, and pervasive.

47.  At all relevant times, Plaintiff was an "employee" within the meaning of the Title VII, and Defendant was an "employer" within the meaning of the Title VII.

48.  As outlined above, Defendant discriminated against Plaintiff because of her sex, race, and perceived national origin, which violated Title VII.

49.  As outlined above, Defendant took adverse employment actions in retaliation to Plaintiff's protected activities of complaining about the pervasive sexual harassment and discrimination she suffered at the hands of her supervisor Ken Burlington and Defendant's strategic partner with whom she was directed to work, Matthew Embrescia.

50. Additionally, Defendant took adverse employment actions in retaliation to Plaintiff's protected activities surrounding her filing of the charge of discrimination with the EEOC and the IDHR.

51. But for Defendant's egregious conduct, Plaintiff would have succeeded in securing subsequent employment much sooner and is therefore entitled to relief.

52. As a direct and proximate result of Defendant's retaliation in violation of Title VII, Plaintiff has suffered, and continues to suffer emotional distress and mental anguish, monetary and economic damages, including, but not limited to, loss of past and future income, compensation, and benefits due to lost or delayed employment opportunities, and Plaintiff's attorney's fees in bringing this action.

## SECOND CLAIM FOR RELIEF

### RETALIATION IN VIOLATION OF IHRA

53. Plaintiff hereby incorporates by reference all paragraphs of this Complaint numbered 1-39 as if fully set forth herein.

54. Plaintiff as a female and a person of color of Indian descent is a member of the classes of citizens protected by the IHRA.

55. Defendant was aware of Plaintiff's sex, race, and color.

56. Defendant has, by its egregious, overt, and continuing acts of discrimination as well as the maintenance of an environment that fostered and encouraged discriminatory conduct, subjected Plaintiff to adverse employment actions and a hostile work environment based on her sex, race, color, and perceived national origin.

57. Defendant created and maintained work environment for the Plaintiff which was both subjectively and objectively offensive, severe, and pervasive.

58.     At all relevant times, Plaintiff was an "employee" within the meaning of the IHRA, and Defendant was an "employer" within the meaning of the IHRA.

59.     As outlined above, Defendant discriminated against Plaintiff because of her sex, race, and perceived national origin, which violated the IHRA.

60.     As outlined above, Defendant took adverse employment actions in retaliation to Plaintiff's protected activities of complaining about the pervasive sexual harassment and discrimination she suffered at the hands of her supervisor Ken Burlington and Defendant's strategic partner with whom she was directed to work, Matthew Embrescia.

61.     Additionally, Defendant took adverse employment actions in retaliation to Plaintiff's protected activities surrounding her filing of the charge of discrimination with the EEOC and the IDHR.

62.     But for Defendant's egregious conduct, Plaintiff would have succeeded in securing subsequent employment much sooner and is therefore entitled to relief.

63.     As a direct and proximate result of Defendant's retaliation in violation of the IHRA, Plaintiff has suffered, and continues to suffer emotional distress and mental anguish, monetary and economic damages, including, but not limited to, loss of past and future income, compensation, and benefits due to lost or delayed employment opportunities, and Plaintiff's attorney's fees in bringing this action.

## **THIRD CLAIM FOR RELIEF**

### DISCRIMINATION UNDER 42 USCS § 1981

64.     Plaintiff hereby incorporates by reference all paragraphs of this Complaint numbered 1-62 as if fully set forth herein.

65. Plaintiff as a female and a person of color of Indian descent is a member of the classes of citizens protected by 42 USCS § 1981.

66. Defendant was aware of Plaintiff's sex, race, and color.

67. Defendant has, by its egregious, overt, and continuing acts of discrimination as well as the maintenance of an environment that fostered and encouraged discriminatory conduct, subjected Plaintiff to adverse employment actions and a hostile work environment based on her sex, race, color, and perceived national origin.

68. Defendant created and maintained work environment for the Plaintiff which was both subjectively and objectively offensive, severe, and pervasive.

69. As outlined above, Defendant discriminated against Plaintiff because of her sex, race, and perceived national origin, which violated 42 USCS § 1981.

70. As outlined above, Defendant took adverse employment actions in retaliation to Plaintiff's protected activities of complaining about the pervasive sexual harassment and discrimination she suffered at the hands of her supervisor Ken Burlington and Defendant's strategic partner with whom she was directed to work, Matthew Embrescia.

71. Additionally, Defendant took adverse employment actions in retaliation to Plaintiff's protected activities surrounding her filing of the charge of discrimination with the EEOC and the IDHR.

72. But for Defendant's egregious conduct, Plaintiff would have succeeded in securing subsequent employment much sooner and is therefore entitled to relief.

73. As a direct and proximate result of Defendant's retaliation in violation of 42 USCS § 1981, Plaintiff has suffered, and continues to suffer emotional distress and mental

anguish, monetary and economic damages, including, but not limited to, loss of past and future income, compensation, and benefits due to lost or delayed employment opportunities, and Plaintiff's attorney's fees in bringing this action.

## FOURTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

74. Plaintiff hereby incorporates by reference all paragraphs of this Complaint numbered 1-71 as if fully set forth herein.

75. The Agreement entered into is a valid and enforceable contract.

76. Plaintiff substantially performed her part of the contract.

77. Plaintiff directed all reference requests to Defendant's Talent Development Department, as per the terms of the Agreement.

78. Plaintiff received communication indicating that requests to obtain references from Employer were met with a complete lack of response.

79. As outlined above, Defendant's failure to respond to all aforementioned employment reference requests "by providing only [Plaintiff's] dates of employment and position title" constitutes a breach of contract.

80. Defendant's breach of the agreement caused Plaintiff to lose employment opportunities and delayed career progression, causing her lost income and diminished income growth.

## FIFTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

81. Plaintiff hereby incorporates by reference all paragraphs of this Complaint numbered 1-78 as if fully set forth herein.

82.   Plaintiff had a reasonable expectation of a future business relationship with a company with whom she had completed the final stage of interviews and was awaiting a promised follow up pending a reference check from previous employer.

83.   Defendant, receiving reference requests from prospective employers, has knowledge of all such expectation.

84.   Defendant, being the last employer for over five years, is ideally poised to tarnish Plaintiff's reputation, and given both its general history of rampant racial and gender discrimination as well as the specific race-based and gender-based animus it has repeatedly demonstrated against the Plaintiff, can be reasonably inferred to have purposefully interfered in order to prevent the plaintiff's expectations from ripening.

85.   Defendant's tortious interference caused Plaintiff to lose a significant employment opportunity and delayed career progression, causing her lost income and diminished income growth.

## **REQUESTED RELIEF**

   **WHEREFORE**, Plaintiff respectfully requests the following:

1.   Appropriate declaratory and equitable relief;

2.   Compensatory damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

3.   All economic losses on all claims allowed by law including damages for lost compensation and job benefits and other monetary losses suffered by Plaintiff in an amount to be determined at trial;

4.   An award of Plaintiff's litigation costs and expenses in this action, including

described above in an amount to be determined at trial; and

5. Any further relief that this court deems just and proper, and any other relief as allowed by law.

Date: September 10, 2024,          Respectfully submitted,

                        */s/Rupa Baskaran*
**Rupa Baskaran**
Bar ID 24135822
Admitted to Court of Northern District of Illinois
**WILT TOIKKA KRAFT, LLP**
1629 K Street NW, Suite 300
Washington, DC 20006
202-804-0638, ext. 2105 (direct)
rbaskaran@wtk-law.com